UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2025 FEB 20 PM 4:27
CLERK
BY Al
DEPUTY CLERK

UNITED STATES OF AMERICA )
 )
v. ) Criminal No. 2:25-cr-19-2-3-4-5-6-7-
 ) 8-9-10-11-12-13-14-
GARETH WEST, a.k.a. "Buddy" and "Muscles," ) 15-16-17-18-19-20-
USMAN KHALID, a.k.a. "Paul" and "Pauly," ) 21-22-23-24-25
ANDREW TATTO, a.k.a. "Chevy" and "Truck," )
STEPHAN MOSKWYN, a.k.a. "HK," )
RICKY YLIMAKI, a.k.a. "Ruffles," )
RICHARD FRISCHMAN, a.k.a. "Styx," )
ADAM LAWRENCE, a.k.a. "Carter," )
MICHAEL FILION, a.k.a. "Elvis," )
JIMMY YLIMAKI, a.k.a. "Coop," )
NICOLAS GONZALEZ, a.k.a. "Brady," )
RYAN MELANSON, a.k.a. "Parker," )
JOY KALAFATIDIS, a.k.a. "Blondie," )
DAVID ARCOBELLI, a.k.a. "Phil," )
JONATHAN MASSOURAS, a.k.a. "Borze," )
NICHOLAS SHIOMI, a.k.a. "Keanu," )
ANTONIO IANNACCI, a.k.a. "DJ," )
JONATHAN OUELLET, a.k.a. "Sunny," )
KASSEY-LEE LANKFORD, a.k.a. "Lex," )
SARA BURNS, a.k.a. "Ginger," )
JUSTIN POLENZ, a.k.a. "Happy," )
RYAN THIBERT, a.k.a. "Toast," )
MICHAEL FARELLA, a.k.a. "Honda," )
SEBASTIAN GUENOLE, a.k.a. "Tweeter," )
RYAN BRIDGMAN, a.k.a. "Clint," and )
STEPHANIE-MARIE SAMARAS, a.k.a. "North" )
    Defendants. )

**INDICTMENT**

The Grand Jury charges:

COUNT ONE

1. Between in or about the summer of 2021 and on or about June 4, 2024, the defendants, and others working with them, conspired to defraud elderly individuals in Vermont and elsewhere in the United States out of millions of dollars through a "Grandparent Scam" involving phone calls

1

made from call centers in and around Montreal, Québec, Canada. During these phone calls, members of the fraud conspiracy alleged herein used impersonation and falsehoods to convince elderly victims that their loved ones (typically a grandchild) had been arrested and needed money for bail.

2. Through their participation in the Grandparent Scam described above, between in or about the summer of 2021 and on or about June 4, 2024, in the District of Vermont and elsewhere, the following defendants:

> GARETH WEST, a.k.a. "Buddy" and "Muscles,"
> USMAN KHALID, a.k.a. "Paul" and "Pauly,"
> ANDREW TATTO, a.k.a. "Chevy" and "Truck,"
> STEPHAN MOSKWYN, a.k.a. "HK,"
> RICKY YLIMAKI, a.k.a. "Ruffles,"
> RICHARD FRISCHMAN, a.k.a. "Styx,"
> ADAM LAWRENCE, a.k.a. "Carter,"
> MICHAEL FILION, a.k.a. "Elvis,"
> JIMMY YLIMAKI, a.k.a. "Coop,"
> NICOLAS GONZALEZ, a.k.a. "Brady,"
> RYAN MELANSON, a.k.a. "Parker,"
> JOY KALAFATIDIS, a.k.a. "Blondie,"
> DAVID ARCOBELLI, a.k.a. "Phil,"
> JONATHAN MASSOURAS, a.k.a. "Borze,"
> NICHOLAS SHIOMI, a.k.a. "Keanu,"
> ANTONIO IANNACCI, a.k.a. "DJ,"
> JONATHAN OUELLET, a.k.a. "Sunny,"
> KASSEY-LEE LANKFORD, a.k.a. "Lex,"
> SARA BURNS, a.k.a. "Ginger,"
> JUSTIN POLENZ, a.k.a. "Happy,"
> RYAN THIBERT, a.k.a. "Toast,"
> MICHAEL FARELLA, a.k.a. "Honda,"
> SEBASTIAN GUENOLE, a.k.a. "Tweeter,"
> RYAN BRIDGMAN, a.k.a. "Clint," and
> STEPHANIE-MARIE SAMARAS, a.k.a. "North"

knowingly and intentionally conspired and agreed with each other and others known and unknown to the Grand Jury to devise a scheme and artifice to defraud and to obtain money and property

from victims, by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy

3. The goal of the fraud conspiracy was for the defendants and others to enrich themselves by fraudulently obtaining money from elderly victims of the Grandparent Scam.

## Manner and Means of the Conspiracy

4. It was part of the conspiracy that defendants GARETH WEST, USMAN KHALID, ANDREW TATTO, STEPHAN MOSKWYN, RICKY YLIMAKI, and others managed a network of call centers in and around Montreal, Québec, Canada (the "call centers").

5. It was further part of the conspiracy that the following defendants worked in these call centers in Canada and perpetrated the Grandparent Scam through phone calls made to elderly victims in the United States: RICHARD FRISCHMAN, ADAM LAWRENCE, MICHAEL FILION, JIMMY YLIMAKI, NICOLAS GONZALEZ, RYAN MELANSON, JOY KALAFATIDIS, DAVID ARCOBELLI, JONATHAN MASSOURAS, NICHOLAS SHIOMI, ANTONIO IANNACCI, JONATHAN OUELLET, STEPHAN MOSKWYN, KASSEY-LEE LANKFORD, SARA BURNS, JUSTIN POLENZ, RYAN THIBERT, MICHAEL FARELLA, SEBASTIAN GUENOLE, RYAN BRIDGMAN, and STEPHANIE-MARIE SAMARAS.

6. It was further part of the conspiracy that in order to make phone calls to elderly victims in the United States, members of the conspiracy used the services of:

    a. US Company 1, a voice-over-internet-protocol telephone service provider with

3

headquarters in Los Angeles, California, to allow the call centers to mask the origin of their calls from Canada, and to transmit caller identification information making it falsely appear that the phone calls they made to elderly victims originated from locations within the United States;

b. US Company 2, a voice-over-internet-protocol telephone service provider with headquarters in Belmont, California, to establish an (888) number for a fake law firm known as "Palmer & Associates"; and

c. Canadian Company 1 and Canadian Company 2, telecommunications service providers, by frequently changing the Subscriber Identity Modules ("SIM cards") of cell phones used to perpetrate the Grandparent Scam.

7. It was further part of the conspiracy that each defendant was referred to by an alias, or codename, as captioned herein, to hide the true identities of the perpetrators of the Grandparent Scam.

8. It was further part of the conspiracy that members of the conspiracy worked in the call centers and were responsible for calling elderly victims in the United States by phone and impersonating their children, grandchildren, or other relatives. These individuals were referred to within the conspiracy as "openers." Usually, these "openers" falsely claimed that the elderly victim's relative, typically a grandchild, had been arrested following a car crash and needed money for bail. Openers often followed a script during these phone calls, which members of the conspiracy referred to as the "pitch." Elderly victims were often told that there was a "gag order" in place to prevent the elderly victim from telling anyone about their family member's supposed arrest. Members of the conspiracy commonly referred to individual elderly victims as a "mooch," "client," or "customer."

4

9. It was further part of the conspiracy that openers used spreadsheets containing the personal identifying information of elderly individuals in the United States, including their name, home address, phone number, age, and estimated household income. Members of the conspiracy commonly referred to these spreadsheets as "sheets," and referred to information corresponding to a single elderly individual as a "lead."

10. It was further part of the conspiracy that when an opener successfully convinced an elderly victim that their relative had been arrested, the call was passed (the "handoff") to other co-conspirators working in the call centers, known as "closers," who posed as an attorney representing the elderly victim's relative. Co-conspirators working as closers included RICHARD FRISCHMAN, ADAM LAWRENCE, MICHAEL FILION, JIMMY YLIMAKI, and NICOLAS GONZALEZ. Closers also made phone calls as openers when they were not busy working as closers.

11. It was further part of the conspiracy that openers and closers who were working together to defraud the same elderly victim frequently worked in the same call center. Within the conspiracy, the call centers were referred to as "rooms." The call centers were distinguished by numbers and were labeled "R1," "R2," "R3," etc.

12. It was further part of the conspiracy that individuals working in the call centers were sometimes moved from one call center to another to improve the chemistry between openers and closers, and to increase the success of the Grandparent Scam. Members of the conspiracy referred to these reassignments as "switches."

13. It was further part of the conspiracy that closers typically convinced elderly victims to provide bail money to an individual falsely posing as a bail bondsman, sometimes referred to within the conspiracy as a "pull," who would come to the elderly victim's home to collect the

5

money. The conspiracy referred to this method of perpetrating the Grandparent Scam as "live pick-ups," "LPs," and "loads," and referred to an elderly victim's provision of bail money as a "deal."

14. It was further part of the conspiracy that when a closer successfully convinced an elderly victim to provide bail money, the closer typically informed USMAN KHALID, who then communicated, often through an intermediary, with a co-conspirator who would pose as a bail bondsman in the United States. These communications typically included the elderly victim's address, a fake name to be used by the bail bondsman, the amount of money to be picked up, and an indication that the elderly victim either had cash on hand within their residence (referred to as "cash home") or had to retrieve cash from a bank (referred to as "cash out"). This information was relayed in wire and electronic communications, such as voice calls, text messages, and audio notes, transmitted through encrypted messaging services in interstate and foreign commerce.

15. It was further part of the conspiracy that if a bail bondsman was not within proximity to a potential elderly victim's residence, in some instances the conspiracy used US Company 3 and US Company 4, ridesharing services which provided drivers of vehicle for hire, who picked up the money from the elderly victim and delivered it to a co-conspirator.

16. It was further part of the conspiracy that, in other instances, the closer instructed elderly victims to mail the "bail money" to a pre-selected address in the United States where it would be collected by a co-conspirator. The conspiracy referred to these shipments of money as "packs." The conspiracy used US Company 5, an online real estate marketplace, to find addresses of vacant residences. Packs were then sent to these vacant residences to reduce the chances of the money being intercepted.

17. It was further part of the conspiracy that elderly victims who had fallen for the Grandparent Scam were sometimes called again and told that the amount of money needed for bail had increased, resulting in the need for the elderly victim to provide additional money. Members of the conspiracy referred to these subsequent attempts to defraud elderly victims as "re-loads." When an elderly victim provided substantial sums of money, members of the conspiracy referred to the elderly victim as a "whale."

18. It was further part of the conspiracy that the Grandparent Scam defrauded multiple elderly victims in the District of Vermont. The Grandparent Scam also defrauded, or attempted to defraud, elderly victims in the following states: Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. In total, the Grandparent Scam defrauded hundreds of elderly victims across the United States out of millions of dollars per year.

19. It was further part of the conspiracy that money collection teams, including persons posing as bail bondsmen, delivered the money taken from elderly victims to co-conspirators in New York City, Chicago, and other locations, for safekeeping and eventual transmission to co-conspirators in Canada. Members of the conspiracy sometimes referred to an individual to whom the money was delivered as a "safe house."

20. It was further part of the conspiracy that members of the money collection teams then conducted further transactions to transmit the money taken from elderly victims to Canada, where

it was delivered to the defendants, often by RICKY YLIMAKI at the direction of ANDREW TATTO. These transactions obscured the source of the money and the identities of the co-conspirators who collected and controlled the money, and promoted and paid the operating expenses of the Grandparent Scam. These transactions often involved the use of cryptocurrency. Millions of dollars of proceeds of the Grandparent Scam, including money taken from elderly victims in Vermont, were eventually converted to Canadian dollars for use in Canada.

21. It was further part of the conspiracy that to perpetrate the Grandparent Scam and to coordinate transactions involving the proceeds of the Grandparent Scam, members of the conspiracy used various means to communicate with each other, and with other co-conspirators in Canada, the United States, and Panama, including text messages, phone calls, audio messages, emails, and encrypted messaging applications.

22. It was further part of the conspiracy that on or about June 4, 2024, when law enforcement in Canada executed Court-authorized search warrants at several call centers and other locations, RICKY YLIMAKI was found in his truck with numerous cell phones and lists of elderly individuals in multiple states. The following defendants were also found in the following call centers, in the act of placing phone calls to elderly victims in Virginia:

   a. STEPHAN MOSKWYN, ADAM LAWRENCE, JIMMY YLIMAKI, SARA BURNS, RYAN THIBERT, and RYAN BRIDGMAN were found in a call center located at 1788 Route Harwood, Vaudreuil-Dorion, Québec.

   b. RICHARD FRISCHMAN, MICHAEL FILION, RYAN MELANSON, JOY KALAFATIDIS, NICHOLAS SHIOMI, JONATHAN OUELLET, STEPHANIE-MARIE SAMARAS, and MICHAEL FARELLA were found in a call center located at 7 Avenue de la Baie de Valois, Pointe-Claire, Québec.

   c. NICOLAS GONZALEZ, DAVID ARCOBELLI, ANTONIO IANNACCI, KASSEY-LEE LANKFORD, JUSTIN POLENZ, and SEBASTIAN GUENOLE were found in a call center located at 13 Avenue de la Baie de Valois, Pointe-Claire, Québec.

(18 U.S.C. §§ 1349, 1343)

## COUNT TWO
(Money Laundering Conspiracy)

23. The allegations contained in paragraph 1 and paragraphs 4 through 22 of this Indictment are realleged and incorporated herein.

24. Between in or about the summer of 2021 and on or about June 4, 2024, the following defendants:

> GARETH WEST, a.k.a. "Buddy" and "Muscles,"
> USMAN KHALID, a.k.a. "Paul" and "Pauly"
> ANDREW TATTO, a.k.a. "Chevy" and "Truck,"
> STEPHAN MOSKWYN, a.k.a. "HK," and
> RICKY YLIMAKI, a.k.a. "Ruffles"

knowingly, intentionally, and unlawfully combined, conspired, confederated, and agreed with each other, and with others, known and unknown to the Grand Jury, to commit money laundering, by:

   a. knowingly conducting and attempting to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole or in part to promote the carrying on of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(A)(i);

   b. knowingly conducting and attempting to conduct financial transactions affecting interstate commerce and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole or in

part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(B)(i);

c. transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer, a monetary instrument or funds from a place in the United States to and through a place outside the United States, knowing that the monetary instruments or funds involved in the transportation, transmission, and transfer, and attempted transportation, transmission, and transfer, represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer, and attempted transportation, transmission, and transfer, was designed in whole or in part to promote the carrying on of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(2)(A);

d. transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer, a monetary instrument or funds from a place in the United States to and through a place outside the United States, knowing that the monetary instruments or funds involved in the transportation, transmission, and transfer, and attempted transportation, transmission, and transfer, represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer, and attempted transportation, transmission, and transfer,

was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

e. knowingly engaging and attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, in violation of Title 18, United States Code, Section 1957(a).

(18 U.S.C. §§ 1956(h), 1956(a)(l)(A)(i), 1956(a)(l)(B)(i), 1956(a)(2)(A), 1956(a)(2)(B)(i), 1957(a))

## FORFEITURE NOTICE

25. Paragraphs 1 through 24 of this Indictment are hereby re-alleged and incorporated by reference for purposes of alleging criminal forfeiture.

26. The United States hereby gives notice to the defendants charged in Count One that, upon conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offense.

27. The United States hereby gives notice to the defendants charged in Count Two that, upon conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in each offense of conviction in violation of Title 18, United States Code, Sections 1956 and 1957, or conspiracy to commit such offenses, and all property traceable to such property.

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described in this forfeiture allegation.

A TRUE BILL

███████████████

FOREPERSON

*Michael P. Drescher* (NTB)

MICHAEL P. DRESCHER
Acting United States Attorney
Burlington, Vermont
February 20, 2025